**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| **VERSUS** | **NO. 22-158** |
| **DAMON WILLIAMS** | **SECTION: N** |

**ORDER AND REASONS**

Before the Court is Defendant Damon Williams's Motion to Suppress Evidence and Fruits of Illegal Search.[1] The Government filed a response in opposition,[2] and Williams filed a reply in further support of his motion.[3] The Court held a hearing on the motion on July 22, 2026. After careful consideration of the parties' memoranda, evidence and argument presented at the hearing, the record, and the applicable law, the motion to suppress is denied.

## I. Background

On September 25, 2025, a federal grand jury returned a superseding indictment[4] charging Williams with possession with (1) the intent to distribute 40 grams or more of fentanyl and heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 841(b)(1)(C); (2) possession of a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c); and (3) possession of a firearm and ammunition by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8).[5] The

---

[1] R. Doc. 93.
[2] R. Doc. 99.
[3] R. Doc. 103.
[4] Williams' original indictment charged him with (1) possession with the intent to distribute 40 grams or more of fentanyl, in violation of 21 U.S.C. § 841(a)(1); (2) possession of a firearm in furtherance of a drug trafficking crime under 18 U.S.C. § 924(c); and (3) possession of a firearm by a felon. R. Doc. 14.
[5] R. Doc. 72.

indictment also alleged Williams had the predicate convictions to be considered an armed career criminal under 18 U.S.C. § 924(e).

Williams filed the current motion seeking to suppress the contraband, firearms, and statements that were recovered by FBI agents during a search at 10901 Willow Brae Drive on June 27, 2022.[6] That search was undertaken pursuant to a search and seizure warrant issued on June 24, 2022, after a special agent presented a warrant application to the magistrate judge.[7] In the 19-page affidavit submitted in support, the special agent stated that there was probable cause to believe that Williams had committed, is committing, or will commit three offenses: (1) conspiracy to distribute controlled substances, (2) murder in furtherance of a drug crime, and (3) felon in possession of a firearm and ammunition.[8] He believed there was likely to be evidence of two murders at the target residence, including biological and forensic evidence, firearms, and ammunition.[9]

## A. Affidavit Filed in Support of Search Warrant Application

To show probable cause, the affidavit stated the following.

On April 3, 2022, Steven Duncan, a federally convicted drug dealer, went missing.[10] On May 7, 2022, Duncan's body was found near Stennis Space Center in Hancock County, Mississippi, with several tires covering his lower body.[11] Law enforcement recovered two .22 caliber projectiles from his skull.[12] Alongside his body

---

[6] R. Doc. 93.
[7] R. Doc. 93-2.
[8] *Id.* ¶ 3.
[9] *Id.* ¶ 7.
[10] *Id.* ¶¶ 8, 12.
[11] *Id.* ¶ 31.
[12] *Id.*

were several car parts marked with "Honda" and which were consistent with a Honda Accord sedan.[13] Duncan had been living at a halfway house in New Orleans while serving the remainder of his sentence for a federal conviction in 2020 for conspiracy to distribute and possess with the intent to distribute one kilogram or more of heroin in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846.[14] The Drug Enforcement Administration received information in or around March 2022 that Duncan was again selling kilogram-quantities of narcotics, likely heroin.[15]

DEA agents, FBI agents, and other law enforcement, through their investigation, concluded that Damon Williams was the main suspect for Duncan's murder. The following indicia, all of which were set forth in the affidavit submitted with the search warrant application, led law enforcement to that conclusion.

One of Duncan's girlfriends informed agents that she obtained video surveillance of Duncan arriving at his friend Cedric Trim's residence on April 3, 2022, with a white sedan with dark tinted windows also arriving at around the same time.[16] Agents recovered surveillance video showing Duncan entering the white sedan (consistent with a Honda Accord) with a driver before the vehicle drove off from Trim's house and appeared to travel onto Interstate 10 heading westbound.[17]

---

[13] *Id.*
[14] *Id.* ¶¶ 8-9.
[15] *Id.* ¶ 11.
[16] *Id.* ¶ 14.
[17] *Id.* ¶¶ 14-16.

Through their investigation, law enforcement obtained certain telephone numbers belonging to Duncan and Williams.[18] Using historical cell phone location data from Duncan's three telephones obtained through a search warrant, one of the numbers ("Telephone #3") connected Duncan to a cell tower near a residence of Damon Williams at 4951 Demontluzin Street on the morning of April 3.[19] Call logs show that Duncan spoke with a telephone number ("Telephone #4") believed to belong to Williams approximately an hour earlier.[20] Law enforcement concluded that Duncan and Williams arranged to meet at Williams's residence during their call and coordinated travel to Trim's residence, where Duncan got into the white sedan.[21] Geolocation data for Williams's two telephones (Telephone #4 and Telephone #5), also obtained by search warrant, established that both phones traveled between the area of Trim's address and 4951 Demontluzin Street between approximately 10:17 and 10:30 a.m. on the morning of April 3.[22] Both were turned off shortly thereafter. Two of Duncan's telephones were also located in the vicinity of 4951 Demontluzin Street at 10:33 a.m. and remained in the area for approximately an hour, at which point they started to travel southbound and were then turned off.[23] The telephones connected to Duncan were all turned off before noon on the morning of April 3, the

[18] A girlfriend and Cedric Trim provided the telephone numbers for Duncan. A cooperating defendant as well as phone registration records connected Williams to his telephone numbers. *Id.* ¶¶ 14-16, 27, 30; R. Doc. 99 at 4 (citing affidavit).
[19] R. Doc. 93-2 ¶ 21.
[20] *Id.* ¶¶ 21, 24.
[21] *Id.* ¶ 24.
[22] *Id.* ¶ 32.
[23] *Id.*

date he went missing.[24] Two of the three telephones show they were located in the area of New Orleans East shortly before noon.[25]

When Williams's Telephone #5 was turned back on at 1:03 p.m., it was located in New Orleans East, near I-10 and Bullard Avenue.[26] The special agent detailed the travel time between 4951 Demontluzin Street, the location in Mississippi at which Duncan's body was recovered, and the area of I-10 and Bullard Avenue. He concluded that the period of time when Williams's telephones were turned off was consistent with the time needed to murder Duncan at 4951 Demontluzin, dump his body in Mississippi, and return to New Orleans East.[27] He explained that individuals involved in drug trafficking and violent crime are aware that law enforcement can obtain location data from cell phones and will often turn off their phones prior to engaging in criminal activity.[28]

The affidavit further explained that information for Williams's Telephone #5 engaged in incoming and outgoing communications with a phone number for Kennaire Mathieu on April 3 between 2:02 and 2:32 p.m.[29] At the time, Mathieu was serving the remainder of a federal sentence on home confinement and was subject to GPS monitoring. GPS information provided by the Bureau of Prisons established that on April 3, Mathieu left his residence at 2:10 p.m. and arrived in the vicinity of 9801 Old Gentilly Road, New Orleans, at 3:20 p.m. This area contains a number of vehicle

---

[24] *Id.* ¶¶ 17, 18, 21.
[25] *Id.* ¶¶ 18, 21. The third telephone does not have location data on April 3. *Id.* ¶ 17.
[26] *Id.* ¶ 32.
[27] *Id.* ¶ 35.
[28] *Id.* ¶ 23.
[29] *Id.* ¶ 33.

lots. Location data for Telephone #5, used by Williams, was also in the vicinity of 9801 Old Gentilly Road at 3:21 p.m.[30] At approximately 3:30 p.m., both Mathieu and Williams were traveling northbound on Read Boulevard, until they both arrived in the area of 10901 Willow Brae Drive at approximately 3:35 p.m.[31]

Witnesses who knew Williams and Duncan provided further connections between the two men. One informed agents that Williams sometimes used a residence located at 4951 Demontluzin Street, and that, a few days before, the witness saw Williams walk toward a white sedan.[32] This person believed Williams may be involved in Duncan's disappearance and further stated that Williams regularly carried firearms.[33]

The affidavit also explained the agent's belief that Williams was intertwined with the murder of Arnold Jones. Through that investigation, agents knew Williams went by the nickname "D."[34] On June 15, 2022, FBI agents received a tip about the murders of Duncan and Jones.[35] That person, who revealed his first name and phone number, stated that Duncan and Jones were killed by Williams or "D" at or near the house on Demontluzin Street. He further stated that he heard Williams brag about the murders, and he knew that Williams carried firearms and an assault rifle in his vehicle.[36] He explained that Williams had murdered Duncan to eliminate him as a

---

[30] *Id.* ¶ 34.
[31] *Id.*
[32] *Id.* ¶¶ 26-28.
[33] *Id.* ¶¶ 28-29.
[34] *Id.* ¶¶ 36-39.
[35] *Id.* ¶ 41.
[36] *Id.* ¶ 42.

middleman for his fentanyl source in Mexico. The agent corroborated these tips with evidence gathered from other witnesses and phone records.[37]

The FBI installed a pole camera facing 10901 Willow Brea Drive, which revealed Williams entering and exiting the house on a regular basis, as recently as June 22.[38] Agents also obtained Orleans Parish records that revealed Williams was the owner of 10901 Willow Brea Drive, leading to the conclusion that Williams resided at the home.[39]

### B. Issuance and Execution of Search Warrant

On June 24, 2022, having received an application with an affidavit containing the above-detailed information, the magistrate judge signed a search warrant for 10901 Willow Brea Drive as well as a second warrant for 4951 Demontluzin Street, which is not at issue in this motion. The warrant permitted law enforcement to collect evidence of the crimes of conspiracy to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 846; murder in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(j); and felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). The warrant indicated that the agents were looking for drugs and drug paraphernalia; firearms and ammunition; records and documents relating to the distribution of drugs; blood and saliva; clothing; fingerprints and DNA; electronic communication equipment, such as telephones; computer hardware; currency; and indicia of ownership of residence.[40]

---

[37] *Id.* ¶¶ 11, 43.
[38] *Id.* ¶¶ 44-45.
[39] *Id.* ¶ 46.
[40] *See* R. Doc. 93.

On June 27, 2022, FBI agents executed the search warrant at 10901 Willow Brea Drive and seized (1) one Glock Modell 22 .40 caliber pistol with an extended magazine; (2) approximately two ounces of fentanyl and heroin; (3) scales; (4) approximately $2,940.00 in cash; (5) various rounds of ammunition; and (6) one Bushmaster caliber rifle, found in the Dodge Ram parked in the driveway.

The agents arrested Williams, who had been detained at 10901 Willow Brae during execution of the search warrant. FBI and DEA agents *Mirandized*[41] Williams and interviewed him about the murders. Williams denied involvement with the murders but made inculpatory statements about items found during the search.[42] He stated he possessed the Glock firearm in the house and that he "forgot that the rifle was in his car."[43] He also admitted that the recovered substance was fentanyl.

## II. Legal Standard

Williams moves to suppress all physical evidence and statements obtained by law enforcement during the search of 10901 Willow Brae Drive and the subsequent custodial interrogation on the ground that law enforcement violated his Fourth Amendment rights. As the defendant seeking to suppress evidence obtained pursuant to a search warrant, Williams bears the burden of proving by a preponderance of the evidence that the evidence was seized in violation of his constitutional rights.[44]

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

[41] *Miranda v. Arizona*, 384 U.S. 436 (1966).
[42] R. Doc. 99.
[43] R. Doc. 99.
[44] *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993).

seizures."[45] The amendment protects against government intrusion into areas where the people have reasonable expectations of privacy.[46] The Founders crafted the Fourth Amendment, and undertook the American Revolution itself, in "response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity."[47] Thus, where the government seeks to intrude upon such private spaces, *i.e.*, conduct a search, it generally must obtain a warrant supported by probable cause.[48]

The Fourth Amendment provides that warrants should be based on probable cause, "supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."[49] A valid search warrant thus must establish a sufficient nexus between the location to be searched and the evidence sought.[50] The facts to support the nexus must be contained within the warrant affidavit.[51] Probable cause that a person committed a crime does not automatically give law enforcement probable cause to search his house for evidence of a crime; rather, facts in the affidavit must establish a nexus between the house and the

---

[45] U.S. Const. amend. IV.
[46] *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring); *Florida v. Jardines*, 569 U.S. 1, 6-7 (2013); *Carpenter v. United States*, 585 U.S. 296, 304 (2018).
[47] *Riley v. California*, 573 U.S. 373, 403 (2014) (citing 10 Works of John Adams 247-48 (C. Adams ed. 1856)).
[48] *Carpenter*, 585 U.S. at 304.
[49] U.S. Const. amend. IV.
[50] *United States v. Wilson*, 153 F.4th 478, 485 (5th Cir. 2025).
[51] *United States v. Magee*, No. 25-03, 2026 U.S. Dist. WL1030324, at *4 (E.D. La. April 16, 2026).

evidence sought.[52] That nexus may be established through direct observation or "normal inferences as to where the articles sought would be located."[53]

Probable cause also must exist at the time the warrant is issued to ensure the information or evidence is not stale.[54] The facts in a search warrant application must be "closely related in time to the issuance of the warrant in order to justify a finding of probable cause at that time."[55] However, if the evidence sought is the kind that could be reasonably be expected to be kept in the place searched for a long period of time, staleness is less likely to be an issue.[56]

While the Fourth Amendment contains no express provision precluding the use of evidence obtained in violation of its terms, "courts have embraced the so-called 'exclusionary rule'—a judicially created remedy that precludes the use of evidence obtained from an unconstitutional search or seizure."[57] The exclusionary rule aims to protect Fourth Amendment rights through its deterrent effect and thus applies only "where its deterrence benefits outweigh its substantial social costs.[58]

Courts apply an exception to the exclusionary rule when government investigators acted with an objectively reasonable, good-faith belief that they were acting lawfully.[59] In such instances of good faith, any '"deterrence rationale loses

---

[52] *United States v. Freeman*, 685 F.2d 942, 949 (5th Cir. 1982).
[53] *Id.*
[54] *United States v. Contreras*, 905 F.3d 853, 858 (5th Cir. 2018).
[55] *United States v. McKeever*, 5 F.3d 863, 866 (5th Cir. 1993).
[56] *Contreras*, 905 F.3d at 858.
[57] *United States v. Beverly*, 943 F.3d 225, 232 (5th Cir. 2019).
[58] *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (citation modified); *see also Utah v. Strieff*, 579 U.S. 232, 235 (2016) (same).
[59] *United States v. Leon*, 468 U.S. 897, 920-24 (1984).

much of its force.'"[60] "'If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional.'"[61] Thus, even when an affidavit for a warrant is found to be insufficient to establish probable cause, the evidence will not be suppressed if it was "obtained by officers in objectively reasonable good-faith reliance upon a search warrant."[62] Courts apply a balancing approach to make this determination, in accordance with the Supreme Court's instruction that "the suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule."[63] Further, an officer is acting in good faith when "acting as a reasonable officer would and should act in similar circumstances," particularly when those actions are coupled with a search warrant.[64]

Here, Williams challenges the application of the good faith exception based on the lack of indicia of probable cause in the warrant affidavit. This exception "does not apply—and the evidence is inadmissible—if the affidavit was 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'"[65] In particular, the good-faith exception will not apply (1) when the issuing magistrate was misled by information in an affidavit that the affiant knew or reasonably should

---

[60] *Id.* at 919 (quoting *United States v. Peltier*, 422 U.S. 531, 539 (1975)).
[61] *Id.* (quoting *Peltier*, 422 U.S. at 539).
[62] *United States v. Satterwhite*, 980 F.2d 317, 320 (5th Cir. 1992) (citing *Leon*, 468 U.S. at 922-23).
[63] *Leon*, 468 U.S. at 918.
[64] *Id.* at 920 (quoting *Stone v. Powell*, 428 U.S. 465,539-40 (1976) (White, J., dissenting)).
[65] *Wilson*, 153 F.4th at 484 (quoting *Leon*, 468 U.S. at 923).

have known was false; (2) when the issuing magistrate wholly abandoned his judicial role; (3) when the warrant affidavit is so lacking in indicia of probable cause as to render official belief in its existence unreasonable; and (4) when the warrant is so facially deficient in failing to particularize the place to be searched or things to be seized that an executing officer cannot reasonably presume it to be valid.[66] Such affidavits are often characterized as "bare bones," tend to consist of "wholly conclusory statements," and do not provide the facts and circumstances necessary to link the criminal activity to the place being searched.[67]

## III. Analysis

### A. The Good Faith Exception to the Exclusionary Rule Applies

Williams argues that the good faith exception to the exclusionary rule does not apply here because no reasonable officer could conclude probable cause exists from the affidavit.[68] He argues the affidavit provided an insufficient nexus between the alleged criminal activity and 10901 Willow Brea Drive.[69] Williams also emphasizes that evidence can be suppressed because of an affidavit's shortcomings, like one containing "only a conclusory 'belief statement'"—rather than facts—about a "nexus between the place to be searched and the evidence sought."[70]

---

[66] *Beverly*, 943 F.3d at 232-33.
[67] *Satterwhite*, 980 F.2d at 321; *see also United States v. Brown*, 567 F. App'x 272, 282 (5th Cir. 2014) ("It was a 'bare bones' affidavit, containing only 'wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause.'" (quoting *Satterwhite*, 980 F.2d at 320-21)).
[68] R. Doc. 93.
[69] *Id.*
[70] *Id.* at 18.

The Government counters that the officers here acted in good faith when they obtained and executed the search warrant.[71] The Government further contends that none of the four circumstances that could preclude application of the good faith exception are present here:[72] the magistrate judge was not misled by information in the affidavit; the magistrate judge did not wholly abandon her role; the warrant was not based on such a lack of probable cause to render the warrant unreasonable; and the warrant was not so facially deficient that the executing officers could not have reasonably presumed it to be valid.[73] The Government contends that if the court finds that the good faith exception applies, then the court need not question if there was probable cause.[74]

Here, the warrant and the accompanying affidavit are not lacking such that a reasonable officer could not rely on it. The affidavit possesses documentation from cell phone location data placing Williams at or near Willow Brea on the day Duncan was murdered, shortly after the murder is believed to have occurred; documentation placing Williams and Duncan in communication and in the same physical locations earlier that same day before their phones were turned off; documentation that Williams was located in places consistent with his involvement in Duncan's murder before he arrived in the Willow Brae neighborhood; video evidence of Williams near Willow Brea in the days preceding the search; and documentation establishing

[71] R. Doc. 99.
[72] *Id.*
[73] *Id.*
[74] *Id.*

Willow Brea as Williams' residence.[75] Based on all of this information, a reasonable officer could conclude that evidence of the suspected crimes could be found at the Willow Brae residence. The circumstantial evidence collected through phone records, tips, and corroborating individuals created a sufficient nexus between the evidence sought and Williams' residence, 10901 Willow Brea Drive, from which an officer could presume the warrant was valid.

Evidence collected to establish probable cause "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement."[76] The nexus presented in warrants may be established through direct observation or through inferences of where evidence sought could reasonably be located.[77] In *Bell*, the Court found officers provided "enough observations and inferences" to prove a nexus between the suspect and the residence searched.[78] There, the affidavit included observations of the suspect's cars outside of the residence, arrest records indicating the searched residence was the suspect's last known address, observations that the suspect drove from the residence to drug sales, and inferences drawn from a detective's training and experience that those individuals involved in the drug trade often keep contraband in their residences.[79] Similarly, in *Norman*, the court found an affidavit provided a sufficient nexus to apply the good-faith exception to search a suspect's house and car. The officers had reasonably relied

---

[75] R. Doc. 93-2 ¶ 24.
[76] *Illinois v. Gates*, 462 U.S. 213, 231-32 (1983).
[77] *United States v. Norman*, 129 F.4th 874, 876 (2025).
[78] *United States v. Bell*, 832 F. App'x 298, 301 (2020).
[79] *Id.* at 301-02.

on a warrant based upon an affidavit that included texts messages of the suspect coordinating a drug deal and observations of the suspect leaving and entering his house after driving to a drug transaction in his vehicle.[80]

Additionally, the present 19-page affidavit is distinguishable from the "bare bones" affidavit in *Wilson*.[81] In *Wilson*, when the officers searched the defendant's girlfriend's apartment, the supporting affidavit offered no facts suggesting why the pistol—the weapon used in the assault at issue—would be present at that particular apartment.[82] The court found the affidavit offered only a "bald assertion" that the officers merely believed the pistol to be located there.[83] The court reasoned that it could not defer to the magistrate judge's probable cause determination because the affidavit contained no facts to establish a nexus between the address searched and the assault at issue.[84] That lack of evidence contrasts with the present case, where the warrant affidavit contained evidence connecting Williams to both the victim and the location to be searched on the day of the suspected crime, with evidence that he was also located in places consistent with his involvement in the crime before arriving at the Willow Brae residence.

Officers and a judge "could draw reasonable, common-sense inferences" from the affidavit here.[85] Like the affidavit in *Bell*, which relied on inferences from public records and observations of the suspect's nexus to the searched residence, the officers

---

[80] 129 F.4th 874
[81] *United States v. Wilson*, 153 F.4th 478, 486 (5th Cir. 2025).
[82] *Id.* at 487.
[83] *Id.*
[84] *Id.* at 489.
[85] *Id.* at 877.

here reasonably relied on witness observations and Orleans Parish records to establish that Williams resided at the Willow Brea residence.[86] The present affidavit also utilized camera footage that observed Williams entering the Willow Brea residence within days of the execution of the search warrant.[87]

Further, officers reasonably relied on phone records and location data as well as witness corroboration.[88] Law enforcement officers were able to track Williams's location on the day of Duncan's murder, connecting him to Duncan, 9801 Old Gentilly Road and its nearby vehicle lots, and then later to 10901 Willow Brea Drive.[89] Williams's connection to Duncan was further corroborated by a cooperating witness.[90] Law enforcement also believed Williams was intertwined with Duncan's murder because of a FBI tip revealing that they heard Williams brag about his murder as well as another one.[91] This FBI tip was corroborated with evidence gathered from other testimony and phone records.[92] In short, the evidence in the affidavit was supported by phone records, multiple tips and testimonies, and inferences reasonably concluded from the investigation.

The Court finds that the officers' execution of the 10901 Willow Brea Drive search warrant was "objectively reasonable," as it relied on "the magistrate's probable-cause determination and on the technical sufficiency of the warrant."[93]

---

[86] R. Doc. 93-2 ¶¶ 41-43, 46.
[87] *Id.* ¶¶ 44-45.
[88] *Id.* ¶¶ 32-35.
[89] *Id.* ¶ 34.
[90] *Id.* ¶¶ 41-42.
[91] *Id.* ¶ 43.
[92] *Id.* ¶ 43.
[93] *Leon*, 468 U.S. at 898.

Because the officers acted in good faith, the fruits and evidence found at 10901 Willow Brea Drive on June 27, 2022, should not be suppressed.

**B. The Warrant is Supported by Probable Cause**

Having determined that the good-faith exception does apply, the Court also concludes that the warrant was supported by probable cause and that the warrant was not stale. Probable cause is determined by an assessment, based on a totality of the circumstances, of whether contraband or evidence of a crime would be found at a particular place.[94] Great deference is given to the magistrate judge's determination unless the affidavit is "devoid of facts."[95]

The Court finds it appropriate to defer to the magistrate judge's determination that the affidavit possessed probable cause and a sufficient nexus that evidence and contraband could be found at Williams's residence.[96] The affidavit lists items that agents would look for, such as biological and forensic evidence, firearms, ammunition, drug paraphernalia, clothes, and currency.[97] The four corners of the affidavit and warrant present sufficient evidence of probable cause that those items could be found at Willow Brea for the reasons discussed.

Additionally, the Court rejects Williams's argument that the information the affidavit and warrant were based on was "too stale [to] create probable cause."[98] "The amount of delay which will make information stale depends upon the particular facts

---

[94] *Wilson*, 153 F.4th at 489.
[95] *Id.*
[96] *See* Section III.A.
[97] R. Doc. 93-2 ¶ 7; *see also id.* at 22 (Att. B).
[98] R. Doc. 103.

of the case, including the nature of the criminal activity and the type of evidence sought."[99] The items listed in the affidavit here are items that a magistrate judge or officer could reasonably believe could still be found at William's residence. In particular, location data indicated that Williams traveled to his Willow Brea residence immediately after he allegedly participated in a murder undertaken in connection with alleged drug trafficking, and two individuals informed law enforcement that Williams carried firearms and an assault rifle in his vehicles. Staleness is less likely to be an issue for the kind of evidence that would be kept in a certain place for a long period of time.[100] Moreover, when an affidavit "shows a long-standing, ongoing pattern of criminal activity, even if fairly long periods of time have lapsed between the information and the issuance of the warrant, the information need not be regarded of stale."[101] Because of the nexus created in the affidavit between the alleged crimes and 10901 Willow Brea Drive, and the ongoing nature of the distribution of narcotics and firearms offenses, the Court finds that it was reasonable to believe that firearms, narcotics, clothing, and trace amounts of blood or DNA would still be in an Williams's home after a period of time.[102]

Finally, because the Court finds the search was lawful, the *Mirandized* statements by Williams are not fruit of the poisonous tree and will not be suppressed.[103]

---

[99] *United States v. Allen*, 625 F.3d 830, 842-44 (5th Cir. 2010).
[100] *Contreras*, 905 F.3d at 858.
[101] *United States v. Webster*, 734 F.2d 1048, 1056 (5th Cir. 1984).
[102] R. Doc. 93-2 ¶¶ 47-48.
[103] *See United States v. Martinez*, 486 F.3d 855, 864 (5th Cir. 2007) (quoting *United States v. Rivas*, 157 F.3d 364, 368 (5th Cir. 1998)).

## IV. Conclusion

For the foregoing reasons,

**IT IS HEREBY ORDERED** that the Motion to Suppress Evidence and Fruits of Illegal Search[104] is **DENIED.**

New Orleans, Louisiana, August 21, 2026.

Anna St John

ANNA ST. JOHN
UNITED STATES DISTRICT JUDGE

[104] R. Doc. 93.